UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

SHAMEEK CHAMPAGNE, CHRISTINA JENKINS,
and ISAIAH JENKINS,

|  |  |
|---|---|
| | **FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| Plaintiffs, | |
| -v- | <u>**11-CV-5644 (RRM) (SMG)**</u> |

THE CITY OF NEW YORK, New York City Police
Department Officer ("OFFICER") MICHAEL McAVOY
(Shield No. 15100); Sergeant ("SGT.") STEVEN
SPATTARO (Shield No. 0324), SGT. JOSEPH FIGLIOZZI
(Shield No. 3204); OFFICER CHRISTOPHER LOFREDO
(Shield No. 6443); OFFICER ROBERT URIBE (Shield No.
20097); OFFICER TONY BROWN (Shield No. 13357);
OFFICER JUAN JORGE (Shield No. 27039); OFFICER
LARRY CRUZ (Shield no. 27211); Lieutenant ("LT.")
ALBERT ISAAC; Detective ("DET.") MICHAEL
FRIEDMAN (Shield No. 6423); LT. DAVID COURTIEN;
DET. STEVEN SPOSITO (Shield No. 5103); DET. PAUL
FAZIO (Shield No. 6923); DET. MICHAEL RIVERA
(Shield No. 5055); OFFICER JOHN DOE 1 through
OFFICER JOHN DOE 4 (the name John Doe and Richard
Roe being fictitious, as the true names and shield numbers
are presently unknown), in their individual capacities,

Defendants.
------------------------------------------------------------------------x

      Plaintiffs SHAMEEK CHAMPAGNE, CHRISTINA JENKINS, and ISAIAH JENKINS,

by their attorneys DAVID B. RANKIN and ROBERT M. QUACKENBUSH of the Law Office

of Rankin & Taylor, as and for their first amended complaint, hereby state and allege:

<u>**PRELIMINARY STATEMENT**</u>

1.  This is a civil rights action brought to vindicate plaintiffs' rights under the First, Fourth and

    Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

    Act of 1871, <u>as amended</u>, codified as 42 U.S.C. § 1983; the Americans with Disabilities Act

of 1990, <u>as amended</u>, codified as 42 U.S.C. § 12132, <u>et seq</u>. ("ADA"); and pendant claims through the Constitution and laws of the State of New York.

2.  Plaintiffs SHAMEEK CHAMPAGNE, CHRISTINA JENKINS and ISAIAH JENKINS' rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis arrested, and used gratuitous, unlawful force against the plaintiffs. By reason of defendants' actions, including their unreasonable use of force, plaintiffs were deprived of their constitutional and common law rights.

3.  Plaintiffs also seek an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983, 1988 for violations of plaintiffs' rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States; and under the ADA.

5.  Pursuant to New York State General Obligations Law § 50-G, the plaintiffs each filed a timely Notice of Claim with the New York City Comptroller on or about September 21, 2010, within ninety (90) days of the events herein complained of. Thus, this Court has supplemental jurisdiction over plaintiffs' claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

6.  None of plaintiffs' claims have been adjusted by the New York City Comptroller's Office.

7.  Venue is proper pursuant to 28 U.S.C. § 1391 in that plaintiffs' claims arose in the Eastern District of New York.

8.  An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## **PARTIES**

9.  Plaintiffs SHAMEEK CHAMPAGNE, CHRISTINA JENKINS and ISAIAH JENKINS are, and were at all times relevant to this action, residents of the State of New York and the County of Richmond.

10. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by NYPD.

11. Defendants New York City Police Department Officer ("OFFICER") MICHAEL McAVOY (Shield No. 15100), Sergeant ("SGT.") STEVEN SPATTARO (Shield No. 0324), SGT. JOSEPH FIGLIOZZI (Shield No. 3204); OFFICER CHRISTOPHER LOFREDO (Shield No. 6443); OFFICER ROBERT URIBE (Shield No. 20097); OFFICER TONY BROWN (Shield No. 13357); OFFICER JUAN JORGE (Shield No. 27039); OFFICER LARRY CRUZ (Shield No. 27211); Lieutenant ("LT.") ALBERT ISAAC; Detective ("DET.") MICHAEL FRIEDMAN (Shield No. 6423); LT. DAVID COURTIEN; DET. STEVEN SPOSITO (Shield No. 5103); DET. PAUL FAZIO (Shield No. 6923); DET. MICHAEL RIVERA (Shield No. 5055); OFFICER JOHN DOE 1 through OFFICER JOHN DOE 4 (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD. The individual defendants are being sued herein in their individual capacities.

12. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

13. The true names and shield numbers of defendants OFFICER JOHN DOE 1 through OFFICER JOHN DOE 4 are not currently known to the plaintiff. However, all of said defendants are employees or agents of the NYPD. Accordingly, said defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to N.Y. G.O.L. § 50-E. The Law Department, then, is hereby put on notice (a) that plaintiffs intend to name said officers as defendants in an amended pleading once their true names and shield numbers become known to plaintiffs and (b) that the Law Department should immediately begin preparing their defense in this action.

14. Defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice and gross disregard for plaintiffs' rights.

15. At all relevant times, the defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

**Facts specific to the arrests of, and uses of force against, Mr. CHAMPAGNE and Ms. JENKINS**

16. The events herein complained of occurred principally in the vicinity of 107 Barker Street off Castleton Avenue in Staten Island, New York on September 6, 2010 at approximately 4:30 a.m. and thereafter.

17. Upon information and belief, at approximately 3:30 a.m. on September 6, 2010, in the vicinity of 107 Barker Street, officers of the NYPD, including at least some of the individual defendants, were deployed to break up an argument or fight.

18. Upon information and belief, dozens of people witnessed portions of the argument, including plaintiffs SHAMEEK CHAMPAGNE and CHRISTINA JENKINS.

19. These NYPD officers told everyone in the vicinity to "GO HOME."

20. Accordingly, Ms. JENKINS and Mr. CHAMPAGNE left the area.

21. However, upon information and belief, Ms. JENKINS and Mr. CHAMPAGNE accidentally misplaced the key to the vehicle they were driving, believing they left the key inside the residence where the argument had been occurring.

22. When Ms. JENKINS and Mr. CHAMPAGNE returned to the scene of the argument to look for the key, one (1) of the officers told tried to help them look for the key by shining a floodlight on the NYPD vehicle onto the street.

23. Despite looking around, Ms. JENKINS and Mr. CHAMPAGNE could not find the key.

24. The officer then told Ms. Jenkins and Mr. CHAMPAGNE, in sum and substance, "YOU SHOULD CALL A TOW TRUCK."

25. Accordingly, at approximately 2:35 a.m., Mr. CHAMPAGNE called AAA and requested its lock-out service and a tow truck.

26. Since AAA informed them it would be several hours until the tow truck arrived, and since Mr. CHAMPAGNE had in his possession a set of keys to his brother's vehicle which was parked nearby, Ms. JENKINS and Mr. CHAMPAGNE got into Mr. CHAMPAGNE's brother's car and waited for the tow truck to arrive.

27. Mr. CHAMPAGNE sat in the driver's seat and Ms. JENKINS got into the front passenger's seat.

28. Ms. JENKINS and Mr. CHAMPAGNE waited for AAA to arrive for approximately two (2) hours, until members of the NYPD arrived on the scene.

29. At approximately 4:30 a.m., about fifteen (15) officers of the NYPD approached the area near Mr. CHAMPAGNE's vehicle. Upon information and belief, these officers include but are not limited to defendants McAVOY, SPATTARO, FIGLIOZZI, LOFREDO, URIBE, BROWN, JORGE, CRUZ, ISAAC, and DOE 1.

30. Defendants McAVOY, SPATTARO, FIGLIOZZI, LOFREDO, URIBE, BROWN, JORGE, CRUZ, ISAAC, and DOE 1 approached the vicinity near the car, and McAVOY banged on the car's driver-side window.

31. OFFICER McAVOY then yelled at Mr. CHAMPAGNE, in sum and substance, "GO HOME, GET OUT OF HERE."

32. In response, Mr. CHAMPAGNE replied, in sum and substance, "I can't because I'm waiting for a tow truck."

33. OFFICER McAVOY became upset with this response and, without asking Mr. CHAMPAGNE's consent, opened the driver's side door then violently slammed it shut.

34. In response, Mr. CHAMPAGNE looked at OFFICER McAVOY, but, before Mr. CHAMPAGNE could say anything, OFFICER McAVOY again opened the car door and violently slammed it shut.

35. In response, Mr. CHAMPAGNE locked the door to the car and began to roll up the window.

36. Mr. CHAMPAGNE also attempted to start the engine to the car, but it would not start.

37. While Mr. CHAMPAGNE was trying to start the car, OFFICER McAVOY ordered him to stop the car.

38. In response, Mr. CHAMPAGNE complied with the request.

39. OFFICER McAVOY then asked for Mr. CHAMPAGNE's driver's license.

40. Confused by the request for his identification since he had done nothing wrong, Mr. CHAMPAGNE asked OFFICER McAVOY and SGT. SPATTARO, in sum and substance, "Why?"

41. OFFICER McAVOY responded, in sum and substance, "NOW YOU'RE GETTING A SUMMONS. NEXT TIME I ASK FOR YOUR LICENSE, GIVE IT TO ME."

42. Shocked, Mr. CHAMPAGNE replied, in sum and substance, "A summons for what?"

43. OFFICER McAVOY immediately retaliated against Mr. CHAMPAGNE for his question by stating, in sum and substance, "NOW YOU'RE GOING IN."

44. OFFICER McAVOY and SGT. SPATTARO then immediately grabbed Mr. CHAMPAGNE and tried to pull him through the half-opened window, even though Mr. CHAMPAGNE was never given an opportunity to open the door and surrender to the arresting officers.

45. While this was happening, Mr. CHAMPAGNE was able to unlock the door and open it.

46. As soon as Mr. CHAMPAGNE opened the door, the officers violently pulled him from the car.

47. OFFICER McAVOY, SGT. SPATTARO, and/or other of the individual defendants, acting as a unit, slammed Mr. CHAMPAGNE to the pavement on his chest and placed handcuffs on him.

48. OFFICER McAVOY, SGT. SPATTARO, and/or other of the individual defendants, acting as a unit, then began pummeling Mr. CHAMPAGNE by kicking and punching him, as well as violently using their Asp, or expandable metal baton, upon Mr. CHAMPAGNE as he lay prone and nearly limp on the road.

49. Either OFFICER McAVOY or SGT. SPATTARO also intentionally, wantonly and sadistically used their Asp to strike Mr. CHAMPAGNE in his testicles.

50. In order to cause even further pain and humiliation while the other officers continued beating Mr. CHAMPAGNE, one of the officers attempted to shove his Asp into Mr. CHAMPAGNE's rectum, causing Mr. CHAMPAGNE pain and embarrassment.

51. As other officers were beginning to lift Mr. CHAMPAGNE's limp body from the pavement, SGT. FIGLIOZZI took one (1) last free punch to Mr. CHAMPAGNE's head or face.

52. Simultaneous with the officers grabbing Mr. CHAMPAGNE as described above, other individual defendants, acting as a unit, swarmed towards Ms. JENKINS in the front passenger seat.

53. The officers opened the passenger door, grabbed Ms. JENKINS and threw her to the pavement face-down.

54. Even though Ms. JENKINS was compliant and not resisting, one of the individual defendants drove his or her knee and/or shin into the back of Ms. JENKINS' neck and sat on her neck, causing tremendous pain and causing profound difficulty in breathing to Ms. JENKINS.

55. Similarly, another of the individual defendants sat on Ms. JENKINS' back.

56. Despite her protests that she was having trouble breathing, at least two of the individual defendants intentionally and maliciously continued to sit on Ms. JENKINS' neck and back in order to cause her pain and discomfort.

57. These officers chose not to place handcuffs on Ms. JENKINS at this time. Instead, they continued sitting on her neck and back for several minutes before ever attempting to place handcuffs on her.

58. The use of force upon Ms. JENKINS described above occurred while in the presence and vicinity of at least one other officer, yet that officer chose not to intervene to prevent the other individual defendants from wantonly abusing Ms. JENKINS.

59. Soon thereafter, the two officers tightly rear-cuffed Ms. JENKINS and dragged her off the pavement by her arms, causing extreme pain.

60. This arrest and beating of Ms. JENKINS and Mr. CHAMPAGNE lasted for approximately three (3) minutes.

61. At some point during this beating, Mr. CHAMPAGNE lost consciousness.

62. While Mr. CHAMPAGNE was limp and prone on the pavement with his wrists in handcuffs behind his back, two (2) of the officers lifted Mr. CHAMPAGNE by his upper arms and dragged him along the road towards a police vehicle.

63. After dragging Mr. CHAMPAGNE's body about fifteen (15) to twenty (20) feet along the pavement, one (1) of the officers fell on top of Mr. CHAMPAGNE's back, causing Mr. CHAMPAGNE's torso to be driven into the pavement under the tremendous weight of that officer.

64. Two (2) of the officers then picked up Mr. CHAMPAGNE's body and continued dragging him another fifteen (15) to twenty (20) feet towards the police vehicle.

65. The officers then placed Ms. JENKINS and Mr. CHAMPAGNE into the back of two (2) separate police vehicles, where they each remained for approximately thirty (30) to forty-five (45) minutes.

66. The arrests and beatings of Ms. JENKINS and Mr. CHAMPAGNE were captured on video by at least two (2) neighbors.

67. Upon information and belief, by the time the beating had ended, several officers involved in the incident learned that neighbors, including plaintiff ISAIAH JENKINS (brother of Ms. JENKINS), might be in possession of these videos.

68. Before the police vehicles left the scene with Ms. JENKINS and Mr. CHAMPAGNE, Ms. JENKINS explained to one (1) of the officers that her Nike flip-flops were still laying in the road from when the officers had beaten and arrested her. Accordingly, she asked if she could get her flip-flops back so she would not be barefoot.

69. In reply, the officer refused to allow Ms. JENKINS from getting her footwear back. Thus, Ms. JENKINS remained barefoot until she was given a pair of socks by a nurse at Richmond University Medical Center, as described infra.

70. Ms. JENKINS and Mr. CHAMPAGNE were both taken to the NYPD's 120th Precinct at approximately 5:30 a.m.

71. At the precinct, both Ms. JENKINS and Mr. CHAMPAGNE asked the officers to loosen their handcuffs, since they had been applied tightly and were causing them both pain. However, the officers refused to loosen the handcuffs.

72. Due to their injuries, both Ms. JENKINS and Mr. CHAMPAGNE requested to be taken to the hospital.

73. At approximately 6:30 a.m., officers took Ms. JENKINS and Mr. CHAMPAGNE by ambulance to Richmond University Hospital.

74. At the hospital, the medical staff attended to Ms. JENKINS and Mr. CHAMPAGNE's various injuries incurred during their arrests. They were also both given tetanus shots and painkillers.

75. One (1) of the nurses asked Ms. JENKINS why she was barefoot. In response, Ms. JENKINS told the nurse about how the officers beat her up and left her flip-flops in the road.

76. The nurse then gave Ms. JENKINS a pair of socks to wear. However, she remained without other footwear for the remainder of the time she was in defendants' custody.

77. Ms. JENKINS also informed a nurse that she was menstruating and that she needed feminine hygiene products. The nurse gave Ms. JENKINS some of those products to take with her.

78. However, the officers with Ms. JENKINS told her she could not bring those products back to the precinct with her.

79. Accordingly, Ms. JENKINS was forced to endure the remainder of her time in custody without being able to use any feminine hygiene products, despite her repeated requests to the officers.

80. Later, Ms. JENKINS' mother arrived at the hospital and repeatedly asked to see her daughter, but the officers refused to allow her to see Ms. JENKINS.

81. After about an hour at the hospital, the officers returned Ms. JENKINS and Mr. CHAMPAGNE to the 120th Precinct.

82. At some time within the 120th Precinct, the officers took photographs of and fingerprints from Ms. JENKINS and Mr. CHAMPAGNE.

83. At some point during the day on September 6, 2010, an officer purporting to be from the NYPD's Internal Affairs Bureau ("IAB") asked Ms. JENKINS and Mr. CHAMPAGNE if he would like to give a statement about the incident.

84. Ms. JENKINS and Mr. CHAMPAGNE both complied and gave the IAB officer statements about the incident.

85. This IAB officer took pictures of Ms. JENKINS and Mr. CHAMPAGNE's various injuries, and he conducted photographic line-ups with Ms. JENKINS and Mr. CHAMPAGNE wherein they both identified pictures of OFFICER McAVOY and OFFICER SPATTARO.

86. Both Ms. JENKINS and Mr. CHAMPAGNE spent the night of September 6, 2010 and the morning of September 7, 2010 in the NYPD's custody at the 120th Precinct.

87. At approximately 10:00 a.m. on September 7, 2010, OFFICER McAVOY approached Ms. JENKINS and told her, in sum and substance, "YOU'RE FREE TO GO, I'M NOT ANSWERING YOUR QUESTIONS."

88. Ms. JENKINS was then released from custody without any charges.  Thus, Ms. JENKINS was in defendants' custody for nearly thirty (30) hours.

89. Upon information and belief, despite never having charges issued against her, the NYPD has continued to maintain and possess the fingerprints and photographs of Ms. JENKINS.

90. At approximately 5:00 p.m. on September 7, 2010, the individual defendants issued a desk appearance ticket ("DAT") to Mr. CHAMPAGNE, requiring him to appear in court on October 26, 2010, and thereafter released him from custody.

91. Thus, Mr. CHAMPAGNE was in defendants' custody for almost thirty-seven (37) hours.

92. In Criminal Court of the City of New York, County of Richmond on October 26, 2010, Mr. CHAMPAGNE was charged under P.L. §§ 205.30, 240.20 (1), and 240.26(1), to wit,

resisting arrest, disorderly conduct, and harassment in the second degree.  Said charges were contained on docket number 2010-RI-008377.

93. These charges were based upon the knowingly false allegations sworn to by OFFICER McAVOY.

94. Upon information and belief, OFFICER McAVOY made these false allegations in order to cover-up the unconstitutional conduct undertaken by himself and the other individual defendants.

95. After multiple appearances in the criminal court, the charges against Mr. CHAMPAGNE were eventually dismissed in his favor, in their entirety.

**Facts specific to the arrest and use of force against ISAIAH JENKINS**

96. Upon information and belief, when officers at the precinct learned that video(s) existed of the arrest and beating of Ms. JENKINS and Mr. CHAMPAGNE (herein, "Video"), and when they learned that one (1) of the Videos may have been in the possession of plaintiff ISAIAH JENKINS, several officers went to Mr. JENKINS's apartment in order to retaliate against Ms. JENKINS's family and confiscate the Video. These officers include but are not limited to DET. FRIEDMAN, LT. COURTIEN, DET. SPOSITO, DET. FAZIO, and DET. RIVERA.

97. At approximately 8:25 p.m. on September 7, 2010, Mr. JENKINS was riding his bicycle in the vicinity of 107 Barker Street in Staten Island.

98. As Mr. JENKINS continued riding his bicycle, he noticed an unmarked black car drive up Barker Street past him. This car then pulled a quick U-turn and proceeded back in Mr. JENKINS' direction.

99. When the car came close to Mr. JENKINS, one (1) of the car's occupants, namely, DET. FRIEDMAN, got out of the vehicle and quickly approached Mr. JENKINS. Upon information and belief, the car also contained DET. SPOSITO and/or DET. FAZIO.

100.    When DET. FRIEDMAN got close to Mr. JENKINS, DET. FRIEDMAN tackled Mr. JENKINS off his bicycle and threw him to the pavement, causing a serious injury to his arm.

101.    Upon information and belief, DET. SPOSITO and/or DET. FAZIO then got out of the car and stood by as DET. FRIEDMAN placed Mr. JENKINS under arrest.

102.    The detectives then seized Mr. JENKINS' cellular phone from his possession and attempted to search through its contents. However, the phone was in the "locked" position, so, upon information and belief, the detectives were unable to view the phone's contents at that time.

103.    Upon information and belief, in arresting Mr. JENKINS, the detectives were primarily motivated by a desire to seize the Video and destroy it.

104.    Mr. JENKINS was then transported to the 120th Precinct.

105.    While inside the 120th Precinct, Mr. JENKINS overheard one (1) of the detectives tell another detective that he had seen Mr. JENKINS hanging out with the person who the detectives believed had taken the Video or had possession of the Video.

106.    Mr. JENKINS also overheard one (1) of the detectives ask another detective, in sum and substance, "DID YOU GET IT?"

107.    The other detective replied, in sum and substance, "NO."

108.    Upon information and belief, the question and answer described supra concerned the Video.

## **Facts specific to defendants' failure to accommodate Mr. JENKINS' disability**

109.    Soon after Mr. JENKINS was arrested and placed inside the NYPD vehicle, he immediately began informing officers he was diabetic, he had just taken his medicine, and he needed to eat in order to manage his blood sugar levels. Mr. JENKINS' mother arrived near the scene. In the presence of the officers, Mr. JENKINS' asked his mother to bring him some orange juice. Soon thereafter, Mr. JENKINS' mother went to a nearby store, bought some orange juice for her son, and brought it to him inside the police vehicle.

110.    While Mr. JENKINS was detained in the precinct, he was not given any food or drink despite his repeated requests.

111.    Mr. JENKINS repeatedly explained to officers in the precinct, including but not limited to DET. FRIEDMAN and other officers, that he needed food and medicine in order to manage and treat his serious diabetic condition. However, the officers persisted in refusing Mr. JENKINS' reasonable request for food and medicine.

112.    After an extended time without food or medicine, and due to his diabetic condition of which the officers were aware, Mr. JENKINS became nauseas in the cell and began vomiting profusely.

113.    Mr. JENKINS was experiencing the effects of uncontrolled high blood sugar, causing him to feel weak, dizzy and disoriented, making it difficult to stand.

114.    Accordingly, Mr. JENKINS again requested immediate medical attention from the officers.

115.    The officers did not respond to Mr. JENKINS requests for medical attention.

116.    Soon thereafter, Mr. JENKINS lost consciousness within the cell.

117.    When Mr. JENKINS regained consciousness, he woke up in a hospital bed in Richmond University Medical Center, shackled to his hospital bed by his wrist and ankle.

118.    In order to avoid being shackled to his bed any longer, and in order to expedite his release from custody, Mr. JENKINS informed the medical staff that he no longer needed treatment, leading to his release from the hospital.

119.    From the hospital, officers transported Mr. JENKINS to Central Booking to be charged.

120.    Based upon the knowingly false allegations sworn to by DET. FRIEDMAN, Mr. JENKINS was charged under P.L. §§ 205.30 and 240.20(1), to wit, resisting arrest and disorderly conduct. DET. FRIEDMAN, LT. COURTIEN, DET. SPOSITO, DET. FAZIO, and DET. RIVERA all knew these allegations to be falsehoods, yet they expressly permitted DET. FRIEDMAN to initiate these baseless charges in order to cover for their retaliatory seizure and use of force against Mr. JENKINS, all of which was motivated by their apparent desire to seize and destroy the Video they believed was in Mr. JENKINS' possession.

121.    Following his arraignment, Mr. JENKINS was released from custody in the afternoon of September 8, 2011. Accordingly, Mr. JENKINS was in defendants' custody for approximately 16 to 20 hours.

122.    On January 4, 2011, after several appearances in criminal court on these charges, Mr. JENKINS was offered, and accepted, an adjournment in contemplation of dismissal, a disposition which resulted in the dismissal of the charges against him.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

123.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

124.    Defendants, under color of state law, subjected plaintiffs Mr. CHAMPAGE, Ms. JENKINS, and Mr. JENKINS to the foregoing acts and omissions without due process of law and in violation of their rights, privileges and immunities secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution through 42 U.S.C. § 1983, including, without limitation, deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of plaintiffs' respective persons, including the excessive use of force against all of them; (b) freedom from arrest without probable cause as to Mr. CHAMPAGNE and Ms. JENKINS; (c) freedom from false imprisonment as to Mr. CHAMPAGNE and Ms. JENKINS, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiffs were aware and did not consent; (d) freedom from the lodging of false charges against Mr. CHAMPAGNE and Mr. JENKINS by police officers; (e) freedom from having police officers fabricate evidence against Mr. CHAMPAGNE and Mr. JENKINS; (f) freedom from retaliatory use of force against Mr. JENKINS; and (g) freedom from abuse of process against Mr. CHAMPAGNE and Mr. JENKINS; and (h) freedom from deprivation of liberty without due process of law as to all plaintiffs.

125.    Defendants' deprivation of plaintiffs' constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM**
**FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983**

126.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

127.    Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where

they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

128.    Several of the individual defendants, working as a unit, were present for the above-described incidents and witnessed other defendants, to wit, unlawfully arrest Mr. CHAMPAGNE and Ms. JENKINS and use unlawful force against Mr. CHAMPAGNE, Ms. JENKINS, and Mr. JENKINS.

129.    Defendants' uses of force against all plaintiffs were obviously excessive and unjustified under the circumstances yet none of the defendants took any action or made any effort to intervene, halt or protect the plaintiffs from being subjected to excessive force by other individual defendants.

130.    The individual defendants' violations of plaintiffs' constitutional rights by failing to intervene in other defendants' clearly unconstitutional use of force and plaintiffs' unconstitutional arrests resulted in the injuries and damages set forth above.

## THIRD CLAIM
## *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

131.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

132.    All of the acts and omissions by the named and unnamed individual officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the CITY and its agency, the NYPD.

133.    Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

134.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

135.    The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices: (a) using excessive force on individuals who have already been handcuffed; (b) retaliating against bystanders and witnesses to misconduct by other police officers; (c) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony in order to protect other officers; and/or in order to chill or obstruct persons from lawfully observing arrests of persons; (d) failing to supervise, train, instruct and discipline police officers and encouraging their misconduct; and (e) discouraging police officers from reporting the corrupt or unlawful acts of other police officers and retaliating against officers who report police misconduct.

136.    The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

    a.    <u>Thompson v. City of New York</u>, 10-CV-3603 (ARR) (SMG) (E.D.N.Y.) (while arrestee is handcuffed and compliant, police officers use their Asp, or expandable metal baton, to beat plaintiff and also apply Mace to his face without cause);

    b.    <u>Lotorto v. City of New York</u>, 10-CV-1223 (ILG) (JMA) (E.D.N.Y.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

c.  <u>Zabala v. City of New York</u>, 3771/2010 (Sup. Ct., Kings Co.) (police officers severely beat and TASER a compliant, prone, bloodied and semi-conscious suspect after he had surrendered);

d.  <u>Ashe v. City of New York</u>, 09-CV-9696 (GBD) (THK) (S.D.N.Y.) (police officers beat and use Mace upon arrestees even though they were both already handcuffed and compliant);

e.  <u>Long v. City of New York</u>, 09-CV-9216 (AKH) (S.D.N.Y.); <u>People v. Pogan</u>, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force);

f.  <u>Moise v. City of New York</u>, 09-CV-9855 (DC) (JLC) (S.D.N.Y.) (police officers beat and use Mace upon a compliant arrestee while he was already in handcuffs);

g.  <u>Taylor-Mickens v. City of New York</u>, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

h.  <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal</u>/<u>Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

i.  <u>Carmody v. City of New York</u>, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

j.  <u>McMillan v. City of New York</u>, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k.  <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

l.  Smith v. City of New York, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

m.  Powers v. City of New York, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

n.  Dotson v. City of New York, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

o.  Nonnemann v. City of New York, 02-CV-10131 (JSR) (AJP), 2004 U.S. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

p.  Richardson v. City of New York, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

q.  Barry v. New York City Police Department, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

r.  Taylor v. City of New York, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as Richardson, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

s.  Walton v. Safir, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

t.  Carin v. City of New York, 95-CV-3472 (JFK), 1998 U.S. Dist. LEXIS 1533 (S.D.N.Y.) (bystander arrested while observing the arrest of a street vendor in a public place);

u.  White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

v.  Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in

response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department); and

w. Kaufman v. City of New York, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

137. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, inter alia, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[1]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a

---

[1]    Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

"widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[2]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[3] When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[4] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[5]

138.     The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following:

---

[2]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[3]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[4]     Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[5]     Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[6]
>
> [...]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[7]

b. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[8] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That's a significant increase over previous years, sources said.
> "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

---

[6]    Mollen Commission Report, p. 36.

[7]    Mollen Commission Report, pp. 40-41.

[8]    Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[9]

c.   In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel.  Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest.  According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[10]

d.   In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau.  As explained in an article in the New York Post:

The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.

Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

[Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.

---

[9]     *Id.*

[10]    John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/2008-06-20_claims_of_corruption_at_queens_precinct_.html.

Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[11]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[12]

e.   In early 2010, the CITY recently settled a civil rights lawsuit wherein one Officer Sean Spence[13] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense." According to the attorney for the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[14]

f.   Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations

---

[11]     Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[12]     John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[13]     In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[14]     *Id*.

reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[15]

139.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

    a.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

    b.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    c.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

140.    The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner KELLY.

141.    The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and Commissioner KELLY who all: (i) tacitly accept and encourage a code of silence

---

[15]    David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

142.  All of the foregoing acts by defendants deprived the plaintiffs of federally protected rights, including, but limited to, the rights set forth in paragraphs "123" through "130" supra.

143.  Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiffs of their rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

144.  Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

145.  Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory

limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

146.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiffs, arrest plaintiffs without probable cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiffs' constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

147.    Plaintiffs' injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

148.    The actions of the individual police defendants resulted from and were taken pursuant to the following de facto policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

149.    Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiffs' constitutional rights.

## FOURTH CLAIM
## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT OF 1990

150.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

151.    The named and unnamed defendants, including but not limited to DET. FRIEDMAN and OFFICER DOE 13, were aware that Mr. JENKINS had a serious diabetic condition. They also knew that Mr. JENKINS was in serious diabetic distress, including severe nausea and profuse vomiting, due to their refusals to provide any food or insulin to Mr. JENKINS, despite his repeated requests to defendants that he be provided food, insulin and medical attention.

152.    Defendants' refusals to accommodate Mr. JENKINS' reasonable requests for food, insulin and/or medical attention resulted in him losing consciousness for over an hour and otherwise resulting in serious medical injuries and grave risk to Mr. JENKINS' health and well being.

153.    As a result of the foregoing, Mr. JENKINS suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## FIFTH CLAIM
## RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK
## FOR STATE LAW VIOLATIONS

154.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

155.    The conduct of the individual defendants alleged herein, occurred while he or she was on duty and in uniform, and/or in and during the course and scope of his or her duties and functions as NYPD officers, and/or while he or she was acting as an agent and employee of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is liable to plaintiffs pursuant to the state common law doctrine of respondeat superior.

156.    As a result of the foregoing, plaintiffs were deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**SIXTH CLAIM**
**VIOLATIONS OF THE NEW YORK STATE CONSTITUTION**

157.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

158.    Defendants' conduct alleged herein breached the protections guaranteed to plaintiffs by the New York  State Constitution, Article I, §§ 8, 11, and 12, including (a) freedom from unreasonable seizure of plaintiffs' respective persons, including the excessive use of force against all of them; (b) freedom from arrest without probable cause as to Mr. CHAMPAGNE and Ms. JENKINS; (c) freedom from false imprisonment as to Mr. CHAMPAGNE and Ms. JENKINS, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiffs were aware and did not consent; (d) freedom from the lodging of false charges against Mr. CHAMPAGNE and Mr. JENKINS by police officers; (e) freedom from having police officers fabricate evidence against Mr. CHAMPAGNE and Mr. JENKINS; (f) freedom from retaliatory use of force against Mr. JENKINS; and (g)

freedom from abuse of process against Mr. CHAMPAGNE and Mr. JENKINS; and (h) freedom from deprivation of liberty without due process of law as to all plaintiffs.

159.    Defendants' deprivation of plaintiffs' rights under the New York State Constitution resulted in the injuries and damages set forth above.

## SEVENTH CLAIM
## ASSAULT AND BATTERY

160.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

161.    By the actions described above, defendants did inflict assault and battery upon all of the plaintiffs. The acts and conduct of defendants were the direct and proximate cause of injury and damage to plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

162.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## EIGHTH CLAIM
## FALSE ARREST AND FALSE IMPRISONMENT

163.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

164.    By the actions described above, defendants caused to be falsely arrested or falsely arrested Mr. CHAMPAGNE and Ms. JENKINS, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to

plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

165.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## NINTH CLAIM
## ABUSE OF PROCESS

166.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

167.    By the conduct and actions described above, defendants employed regularly issued process against Mr. CHAMPAGNE and Mr. JENKINS compelling the performance or forbearance of prescribed acts. The purpose of activating the process was intent to harm the Mr. CHAMPAGNE and Mr. JENKINS without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to both Mr. CHAMPAGNE and Mr. JENKINS, which were outside the legitimate ends of the process. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. CHAMPAGNE and Mr. JENKINS and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

168.    As a result of the foregoing, Mr. CHAMPAGNE and Mr. JENKINS were deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**TENTH CLAIM**
**INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

169.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

170.    By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to plaintiffs. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

171.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and were otherwise damaged and injured.

**ELEVENTH CLAIM**
**NEGLIGENCE**

172.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

173.    The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the plaintiff.   The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

174.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## TWELFTH CLAIM
## NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, AND TRAINING

175.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

176.    Defendant CITY negligently hired, screened, retained, supervised, and trained defendants.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

177.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## THIRTEENTH CLAIM
## VIOLATIONS OF THE NEW YORK STATE HUMAN RIGHTS LAW

178.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

179.    The named and unnamed defendants, including but not limited to DET. FRIEDMAN and OFFICER DOE 13, were aware that Mr. JENKINS had a serious diabetic condition. They also knew that Mr. JENKINS was in serious diabetic distress, including severe nausea and profuse vomiting, due to their refusals to provide any food or insulin to Mr. JENKINS, despite his repeated requests to defendants that he be provided food, insulin and medical attention.

180.    Defendants' choice in discriminating against Mr. JENKINS on the basis of his disability resulted in him losing consciousness for over an hour and otherwise resulted in serious medical injuries and grave risk to Mr. JENKINS' health and well being, in violation of the

New York State Human Rights Law, codified as New York State Executive Law § 296, <u>et</u> <u>seq</u>.

181.    As a result of the foregoing, Mr. JENKINS was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

**FOURTEENTH CLAIM**
**<u>VIOLATIONS OF THE NEW YORK CITY HUMAN RIGHTS LAW</u>**

182.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

183.    Defendants' choice in discriminating against Mr. JENKINS on the basis of his disability resulted in him losing consciousness for over an hour and otherwise resulted in serious medical injuries and grave risk to Mr. JENKINS' health and well being, in violation of the New York City Human Rights Law, codified as New York Administrative Code § 8-101, <u>et</u> <u>seq</u>.

184.    As a result of the foregoing, Mr. JENKINS was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

**<u>JURY DEMAND</u>**

185.    Plaintiffs demand a trial by jury in this action on each and every one of their damage claims.

WHEREFORE, plaintiffs demand judgment against the defendants individually and jointly and pray for relief as follows:

a.    That they be compensated for violation of their constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.    That they be awarded punitive damages against the individual defendants; and

c.     That they be compensated for attorneys' fees and the costs and disbursements of this action; and

d.     For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
         May 23, 2012

                                        Respectfully submitted,

                                        /s/
                          By:    _____
                                 David B. Rankin (DR 0863)
                                 Robert M. Quackenbush (RQ 0427)
                                 Law Office of Rankin & Taylor
                                 *Attorneys for the Plaintiffs*
                                 350 Broadway, Suite 701
                                 New York, New York 10013
                                 t: 212-226-4507
                                 f: 212-658-9480